IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Michelle A. Maher, *Ph.D.*, | ) | C/A No. 3:10-2545-MBS-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| The University of South Carolina, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

    The plaintiff, Michelle A. Maher ("Maher"), filed this action asserting claims pursuant to the Equal Pay Act of 1963, 29 U.S.C. § 206(d), as well as a state law claim of defamation against the defendant, the University of South Carolina ("University"). This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendant's motions to dismiss and for summary judgment. (ECF No. 44.) Maher filed a response in opposition (ECF No. 51), and the defendant filed a reply. (ECF No. 55.) Having reviewed the parties' submissions and the applicable law, the court finds that the defendant's motions should be granted.

**BACKGROUND**

    The following facts are either undisputed or are viewed in the light most favorable to Maher, to the extent they are supported by evidence in the record. Maher's educational achievements include two bachelor's degrees, a master's degree, and a doctorate. While pursuing her post-graduate degrees, Maher worked as an assistant to the Dean of the Graduate School of Education at George Mason University and served as an adjunct professor there. After obtaining her Ph.D., she

began work at the University of South Carolina in 2001 as an assistant professor in the Instruction and Teacher Education Department of the College of Education; shortly thereafter, she was reassigned to the Department of Educational Leadership and Policies ("EDLP"), where she remained during all times relevant to this dispute. In 2007 Maher was promoted to associate professor and received tenure. In addition to teaching, Maher held leadership positions in the EDLP, such as Program Coordinator for Higher Education Administration Programs, director of the Ph.D. program in Higher Education Administration, and program coordinator in the master's program. She was a prolific author of published scholarly works and frequently presented at conferences.

In 2009 Maher and the chair of the EDLP department, Dr. Katherine Chaddock, consulted the past department chair, Ken Stevenson, regarding a pay disparity between Maher and two male associate professors who were hired after Maher. Specifically, Dr. Edward Cox received $2,045 more than Maher annually while Dr. Zack Kelehear was paid $5,831 more than Maher. Stevenson accounted for the difference by explaining that Maher had been initially hired into a different department and that no recent funding had been provided for salary increases. Stevenson additionally suggested that, in the past, some funds had been designated to address pay disparity concerns such as Maher's and encouraged her to further inquire into the issue.

Also in 2009 and early 2010, Maher's relationship with a colleague, Dr. Michael Welsh, which had been contentious for some time, became increasingly sour. The tension between them escalated to the degree that the disharmony was common knowledge in the department and Dr. Stevenson noted the problems in Dr. Welsh's 2009 annual performance review. However, the confrontations continued. Following Maher's critical peer reviews of both Dr. Welsh and Dr. Bloom, another faculty member in the EDLP department, Welsh spoke with Bloom and told her that



Maher's review of Bloom made Welsh concerned for Bloom's physical safety. Welsh did not inform Bloom of the contents of the review nor did he identify any specific comments in the review that would cause such concerns. Bloom asked Welsh to show the review to the dean of the college, Dr. Leslie Sternberg, to obtain a second opinion.

Upon reading Maher's review of Bloom, Dean Sternberg observed that he found nothing extraordinary about it. Specifically, Dean Sternberg testified in his deposition that Maher's review was neither inappropriate nor threatening. Nonetheless, apparently because Welsh stated that he and Bloom felt "unsafe,"[1] Sternberg reported the situation to Senior Vice Provost Christine Curtis, who instructed Sternberg to investigate further. Subsequently, a group of administrators including Dean Sternberg, Senior Provost Curtis, Ombudsman James Augustine, and Department Chair Chaddock met regarding the situation, and Dr. Chaddock conducted an investigation including interviews with individuals in Maher's program and the rest of the department. Dr. Chaddock concluded that Welsh's concerns about Maher's constituting a physical threat were wholly unsubstantiated. Nonetheless, the other three administrators continued the investigation, calling in the campus police and continuing to meet with members of Maher's program. Ultimately, Drs. Curtis and Augustine met with Maher on May 4, 2010—the first interview they had with Maher after learning of Dr. Welsh's expressed concerns. They essentially informed her that due to a hostile environment in her program they wanted her to transfer into a program in the business school for a semester. Dr. Augustine informed Maher that she posed a physical threat to others and that she was creating a

---

[1] The record indicates that the concerns expressed by Welsh and the subsequent investigation of Maher were emotionally influenced by a well publicized shooting of three faculty members by a professor who was denied tenure at the University of Alabama–Huntsville, which occurred approximately a few weeks before Maher's performance reviews of Welsh and Bloom.



"highly toxic work environment." (Maher Dep. 49:17-20, ECF No. 51-9 at 49.) Following the meeting, Maher perceived that she had been suspended, as she had been told to stay off campus until the issue of her transfer was resolved.[2] Additionally, the leadership positions Maher held in the EDLP department were reassigned to other faculty members. Maher attempted to file a grievance with Provost Amiridis, but following a meeting with him, Provost Amiridis declined to file Maher's grievance. This action followed.

## DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over

---

[2] Although Maher ultimately learned that Dr. Curtis did not have the authority to suspend her and the record shows that no official suspension was imposed, Maher received an e-mail from a student stating that the student had heard from another professor in the department, Doyle Stevich, that Maher had been suspended. According to Maher, however, Maher never discussed her problems with the administration with Professor Stevich.



facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248. The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

**B.    Maher's Claims**

    **1.    Equal Pay Act**

        **a.    Wage Discrimination**

Congress passed the Equal Pay Act to remedy the serious and endemic problem of males being awarded higher wages than females due to an outdated belief that a man's role in society warrants more pay for equal work. Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). The statute prohibits wage discrimination between employees "on the basis of sex" when their work "requires equal skill, effort, and responsibility, and which [is] performed under similar working conditions . . . ." 29 U.S.C. § 206(d)(1). Thus, courts have held that to establish a *prima facie* case of wage discrimination under the Equal Pay Act, a plaintiff must show: (1) that the employer paid different wages to employees of the opposite sex; (2) that the employees' jobs require equal skill, effort, and responsibility; and (3) that the jobs are performed under similar working environments. Brinkley v. Harbour Recreation Club, 180 F.3d 598, 613 (4th Cir. 1999), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). The comparison must be made between the plaintiff and a particular male comparator on a factor-by-factor basis. Strag v. Bd. of Trustees,



Craven Cmty. Coll., 55 F.3d 943, 948 (4th Cir. 1995).  If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to show by a preponderance of the evidence that the salary difference is justified by one of the four statutory exceptions: "(1) a seniority system, (2) a merit system, (3) a system that measures earnings by quantity or quality of production, or (4) a differential based on any factor other than sex."  Id.; see also 29 U.S.C. § 206(d)(1).  If the employer satisfies this burden, the plaintiff must satisfactorily rebut the employer's evidence.  Strag, 55 F.3d at 948.

Here, Maher proffers three male comparators from the EDLP Department who received a higher salary than she:  Drs. Cox, Kelehear, and Welsh.  However, even assuming she establishes a *prima facie* case with this evidence, she has not rebutted the University's evidence as to each comparator that the salary differential was based on factors other than sex.  As to Dr. Cox, the University has presented evidence showing that he had 28 years of experience as a high school principal or superintendent, which was relevant to the program for which he was hired: Kindergarten through 12 Education Administration.  Courts have recognized that background, experience, and market forces constitute factors other than sex within the meaning of the statutory exception in § 206(d)(1).  See, e.g., Strag, 55 F.3d at 949, 951 (discussing and applying legislative history and cases interpreting § 206(d)(1)).  With regard to Dr. Kelehear, even Maher's expert witness agreed that Kelehear's seven more years' experience as an associate professor than Maher supported his higher salary.[3]  (See Reeves Dep. 25, ECF No. 44-9 at 3.)  Similarly, Dr. Welsh had nineteen years' more experience as associate professor than Maher.

---

[3] While Maher argues that Kelehear received a $6,000 pay increase in 2010, the record unequivocally shows that this raise corresponded to his promotion to full professor, a rank above Maher's.  (See Salary History, ECF No. 44-4 at 94; Maher Dep. 173:8-22; ECF No. 44-3 at 69.)



Maher's evidence regarding her own qualifications, productivity, and professional reputation are insufficient to rebut the University's showing that it paid Drs. Cox, Kelehear, and Welsh more money than Maher based on their professional experience, a reason other than sex. Accordingly, her claim of wage discrimination must fail.

  **b.**  **Retaliation**

The parties agree that to establish a *prima facie* case of retaliation for complaining about the salary disparity, Maher must show: (1) that she engaged in protected activity; (2) that her employer took an adverse action against her; and (3) a causal connection between the adverse action and the protected activity. See, e.g., Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 706 (4th Cir. 2001) (ADA); see also 29 U.S.C. § 215(a)(3). If a plaintiff meets these elements, the burdens shifts to the defendant to show a legitimate, nonretaliatory reason for the adverse action. Haulbrook, 252 F.3d at 706. The plaintiff may then rebut the defendant's proffered reason by showing that it is a pretext for retaliation. Id.

Here, Maher presents three adverse actions the University allegedly took against her: (1) failing to appoint her as the Interim Curriculum and Graduate Director; (2) denying her a salary increase; (3) harassing her by falsely accusing her of being a physical threat and calling into question her fitness as a professor.

As to the first, the University argues that Maher cannot show a causal connection between Maher's complaints about salary disparities and the failure to appoint Maher as Interim Curriculum and Graduate Director because this decision was made by Dean Sternberg before he learned of Maher's salary complaints. See Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) (Title VII) ("Since, by definition, an employer cannot take action because



of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case."). The court agrees that Maher's conjecture that one of the persons she complained to would have relayed her concerns to Sternberg is insufficient as a matter of law in the face of Sternberg's uncontroverted deposition testimony that he did not learn of Maher's salary complaints until after the instant lawsuit was filed. (Sternberg Dep. 11:11-18, ECF No. 44-10 at 4); Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law. Nor can the nonmoving party create a genuine issue of material fact through mere speculation or the building of one inference upon another.") (internal quotation marks and citations omitted).

Next Maher argues that the University's failure to give her a raise constitutes retaliation. This argument fails for several reasons. Although the failure to obtain a raise can be a retaliatory adverse action in certain circumstances, Maher has not shown that she had any expectation or entitlement to a salary increase. Compare Gillis v. Georgia Dep't of Corrs., 400 F.3d 883, 888 (11th Cir. 2005) (holding that receipt of a three percent rather than a five percent raise based on an annual evaluation was an adverse employment action); Fierros v. Texas Department of Health, 274 F.3d 187, 193-94 (5th Cir. 2001), overruled on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (holding that the denial of a recommended merit pay increase was an adverse employment action) with Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1006 (7th Cir. 2000) (recognizing that absent entitlement, failure to receive a bonus or raise is not a material adverse job action); Schmelzer v. Alexander, C/A No. 4:03-354-Y, 2005 WL 723660, at *6 (N.D. Tex. Mar. 29, 2005) ("[T]here is no adverse employment action where an employee does not receive the raise that she



feels she deserves."). Under controlling precedent, a retaliatory act is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks & citations omitted). Whether the alleged act is "materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (internal quotation marks and citation omitted). Here, the undisputed evidence in the record is that since July 2008 no employee in Maher's department received a pay increase unless it accompanied a promotion, and that a lack of state funding prevented other salary adjustments. (Seaman Decl. ¶ 3, ECF No. 44-12 at 2; Maher Dep. Ex 38, ECF No. 44-4 at 54.) Accordingly, applying the White standard to the circumstances of this case,[4] the court finds that Maher cannot show that the failure to give *her* a raise she felt she deserved constituted a materially adverse action in retaliation for her complaints regarding salary disparities. See White, 548 U.S. at 68; Miller, 203 F.3d at 1006; Schmelzer, 2005 WL 723660, at *6. Moreover, Maher's retaliation claim based upon the failure to increase her salary merely attempts to recast her wage discrimination allegations as a retaliation claim using the identical alleged adverse act.

Finally, Maher's contention that the false accusations against her were made in retaliation for her salary complaints also fails as a matter of law. Courts have recognized that for temporal proximity alone to establish causation, the timing of the events must be very close. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (noting that to establish a causal connection

---

[4] The court observes that all the cases cited herein addressing whether the denial of a pay increase constitutes an adverse action were decided before the United States Supreme Court established the standard for an adverse act in a retaliation case in White.



based on temporal proximity alone, the time between the employer's knowledge of the protected activity and the adverse employment action must be "very close" and holding a twenty-month period to be insufficient). Even accepting Maher's contention that the adverse events began in March of 2010, (see Pl.'s Mem. Opp'n Summ. J. at 24, ECF No. 51 at 24), the six-month time lag between her September 2009 salary complaint and the alleged harassment negates any permissible inference of causation. See Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001) ("A six month lag is sufficient to negate any inference of causation").

### 2.     Defamation

As an arm of the State of South Carolina, the University is immune from suit in this forum as to Maher's state law defamation claim. The Eleventh Amendment to the United States Constitution states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Sovereign immunity protects both the State itself and its agencies, divisions, departments, officials, and other "arms of the State." See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); see also Regents of the Univ. of California v. Doe, 519 U.S. 425, 429 (1997) ("[I]t has long been settled that the reference [in the Eleventh Amendment] to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities."); Mt. Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) ("The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances.").



The University is an arm of the State of South Carolina.  See Maryland Stadium Auth. v. Ellerbe Becket, Inc., 407 F.3d 255 (4th Cir. 2005) ("Numerous courts have decided whether public state universities are 'arms of the state.' Almost universally, the answer has been in the affirmative."); Martin v. Clemson University, C/A No. 8:08-354-GRA, 2009 WL 2782182 (D.S.C. Aug. 28, 2009) (holding that Clemson University was an arm of the state entitled to Eleventh Amendment immunity); Johnson v. South Carolina State Univ., C/A No. 5:09-1421-MBS, 2009 WL 1834488 (D.S.C. June 24, 2009) (holding that South Carolina State University was entitled to Eleventh Amendment immunity); S.C. Code Ann. § 59-101-10 (legislatively creating the University of South Carolina and other State colleges and universities); S.C. Code Ann. § 59-107-10 (including the University of South Carolina in the definition of "state institution").[5]  Accordingly, it is immune from suit in federal court[6] unless it waives its immunity—which it expressly has not done—or Congress abrogates its immunity.  See Lapides v. Board of Regents, 535 U.S. 613 (2002) (noting that a State may waive sovereign immunity); Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139 (1993) (stating that absent waiver of Eleventh Amendment immunity, "neither a State nor agencies acting under its control may be subject to suit in federal court") (quotations and citations omitted); S.C. Code Ann. § 15-78-20(e) (expressly stating that the State of South Carolina

---

[5] Moreover, the University satisfies the test announced in Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456 (4th Cir. 1987), to determine whether a governmental entity is an "arm of the state" under the Eleventh Amendment.  The factors of the test include, but are not limited to, the following:  (1) whether the state treasury will be responsible for paying any judgment that might be awarded; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether it is involved with local versus statewide concerns; and (3) how it is treated as a matter of state law.  Id. at 457-58.

[6] The University's immunity applies to suits seeking injunctive relief as well as monetary damages.  See S.C. State Bd. of Dentistry v. Fed. Trade Comm'n, 455 F.3d 436, 447 n.8 (4th Cir. 2006).



does not waive sovereign immunity from suit in federal court); see, e.g., Quern v. Jordan, 440 U.S. 332, 343 (1979) (recognizing that Congress did not override the Eleventh Amendment when it created the remedy found in 42 U.S.C. § 1983 for civil rights violations).  Because the University's immunity is intact with regard to Maher's defamation claim, this claim should be dismissed without prejudice.

## RECOMMENDATION

For all of the foregoing reasons, the court recommends that summary judgment be entered for the University as to Maher's Equal Pay Act claims.  The court further recommends that Maher's defamation claim be dismissed without prejudice.

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

January 10, 2013
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).